# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      **Plaintiff,**

v.                                       No. CR 18-461 JAP

MANUEL CHAVEZ,

      **Defendant.**

## MEMORANDUM OPINION AND ORDER

On February 14, 2018, a federal grand jury returned an indictment charging Defendant Manuel Chavez with being a felon in possession of a firearm contrary to 18 U.S.C. § 922(g)(1). *See* Redacted Indictment. (Doc. 12). On April 30, 2018, Defendant filed a motion to suppress physical evidence, including the firearm, obtained during a search of the vehicle he was driving.[1] The United States filed a response opposing the Motion.[2] The Court held a hearing on Defendant's Motion beginning on June 13, 2018 that continued on June 15, 2018. Having considered the parties' briefing,[3] arguments, and relevant case law, the Court will deny Defendant's Motion.

## I.     BACKGROUND

Federal Rule of Criminal Procedure 12(d) requires that, when factual issues are involved in deciding a motion, the Court must state its essential findings on the record. "[T]he rules of

---

[1] *See* MOTION TO SUPPRESS SEARCH OF VEHICLE (Doc. 26) (Motion).
[2] *See* UNITED STATES' RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS SEARCH OF VEHICLE (Doc. 32) (Response).
[3] In addition to the motion and response, the Court read and considered supplemental briefing from the Defendant and the United States. *See* AMENDED DEFENDANT'S CLOSING ARGUMENT IN SUPPORT OF MOTION TO SUPPRESS EVIDENCE (Doc. 50) (Def. Closing Argument); UNITED STATES' CLOSING ARGUMENT IN OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS EVIDENCE AND ADDITIONAL BRIEFING PURSUANT TO COURT ORDER (DOC. 40) (Doc. 54) (U.S. Supplemental Brief); DEFENDANT'S SUPPLEMENTAL BRIEF (Def. Supplemental Brief) (Doc. 57); UNITED STATES RESPONSE TO DEFENDANT'S SUPPLEMENTAL BRIEF (U.S. Response) (Doc. 61).

evidence normally applicable in criminal trials do not operate with full force at hearings before the judge to determine the admissibility of evidence." *U.S. v. Matlock*, 415 U.S. 164, 172-73 (discussing, in part, Fed. R. Evid. 104(a)[4] and Fed. R. Evid. 1101(d)(1)[5]). "[T]his principle is based on the assumption that more evidence should be included in a pretrial hearing because the judge, unlike a jury, can give the evidence such weight as his judgment and experience counsel." *U.S. v. Conner*, 699 F.3d 1225, 1227-28 (10th Cir. 2012) (internal quotation marks and citation omitted). The Court makes the following factual findings based on the evidence in accordance with Rule 12(d). Importantly, the Court found the testimony of both hearing witnesses, Deputy Eric Castaneda and Deputy Leroy Chavez, to be clear and credible.

Around 12:13 a.m. on January 8, 2018, Bernalillo County Sheriff's Office (BCSO) Deputy Eric Castaneda observed a brown sedan that Defendant[6] was driving run through a stop sign in Albuquerque, New Mexico. (Doc. 26 at 1; Doc.32 at 2; Tr. 11:23-25; 12:12-25). After clearing another traffic stop, Deputy Castaneda caught up to the sedan and engaged his patrol unit's lights to initiate a traffic stop. (Tr. 13:16-18; 14:10-16). The vehicle did not immediately pull over, but continued northbound at a slow rate of speed until finally entering a gas station plaza and parking by a gas pump. (Tr. 15:1-8, 19-21; 17:4-6). Deputy Castaneda parked his vehicle behind the sedan, and began walking toward it. Deputy Castaneda observed the driver of the vehicle to be a Hispanic male wearing a camouflage jacket, a red and white beanie, jewelry around his neck, and an earring in his left ear. (Tr. 20:14-17; 21:5). There was also a small brown and white dog moving about inside the vehicle. (Tr. 21:7-13).

---

[4] Federal Rule of Evidence 104(a) provides that "[t]he court must decide any preliminary question about whether…evidence is admissible. In so deciding, the court is not bound by evidence rules, except those on privilege."

[5] Federal Rule of Evidence 1101(d)(1) states that the rules of evidence do not apply to preliminary fact determinations to be made by the Court under Rule 104.

[6] Because there is no dispute that the driver of the brown sedan was later identified as Defendant, the Court will refer to the driver as Defendant rather than "the driver."

Deputy Castaneda noticed Defendant continually looking at him through the rear and side view mirrors and observed Defendant roll his shoulder, leaning forward, as though he "was reaching down underneath his seat or towards the floorboard." (Tr. 17:14-22; 23:6-14; 78:22-79:1). Deputy Castaneda testified that Defendant's "shoulder roll" "was a great safety issue for me because I didn't know if the driver was reaching for something, a weapon, trying to hide narcotics, contraband, or weapon." (Tr. 24:23-25:5). He was concerned about whether "there were weapons or what were the [driver's] intentions" based on the amount of time it took for Defendant to pull over, the Defendant's "furtive" movements, "the manner he was looking back, how he was again leaning forward," and how he "appeared to be reaching down." (Tr. 25:8-18; 108:1-13). Deputy Castaneda had all of these behaviors in mind as he exited his patrol unit and approached Defendant's vehicle. (Tr. 108:14-15). As Deputy Castaneda reached the back of the car, he touched the trunk and paused briefly. (Tr. 108:15-20). Deputy Castaneda then took his hand off of the trunk, unfastened his holster, and placed his hand onto his gun, prepared to draw the gun if necessary. (Tr. 108:20-109:6). He took one or two steps, at which point Defendant drove off at an accelerated rate of speed. (Tr. 26:19-27:12; 108:14-23).

Deputy Castaneda observed Defendant drive through the parking area, run a red light as he approached Central Avenue, and continue eastbound. (Tr. 28:19-25). He also observed Defendant, who was traveling over the posted speed limit, swerve onto the right lane, causing an ambulance also traveling eastbound to move outside of its lane to avoid a collision. (Tr. 30:8-15; 31:17-32:6). Deputy Castaneda engaged his emergency equipment to initiate a second traffic stop, but rather than pull over, Defendant turned north onto 60th Street from Central Avenue. (Tr. 32:20-25; 34:5-15). Deputy Castaneda briefly lost sight of Defendant, but noticed a lot of dust on a dirt street named Knotts Landing Court. (Tr. 34:10-21). Deputy Castaneda turned onto

the dirt road and through the dust was able to make out a house, a white trailer, and vehicle brake lights or taillights. (Tr. 35:2-8). He exited his patrol unit and began to approach the B pillar[7] of the vehicle with his firearm drawn. (Tr. 38:7-18). Deputy Castaneda could see the small dog in the back seat but there were no other occupants in the vehicle. (Tr. 41:11-13). Having determined that no person was in the vehicle, Deputy Castaneda believed the driver had fled on foot, so he moved to the area between his car and the sedan to wait for assistance. (Tr. 44:5-9; 16-20).

When additional deputies arrived, Deputy Castaneda directed them to establish a perimeter towards the northwest portion of the property where there was open space and a house. (Tr. 47:21-48:6). One of the responding officers was Deputy Leroy Chavez. (Tr. 137:23-138:7). Deputy Chavez testified that when he arrived at the Knotts Landing location, a number of other deputies were already on the scene. (Tr. 140:3-6). Deputy Chavez made contact with Deputy Castaneda who stated that he believed the male driver ran into the residence or in a western direction. (Tr. 141:21-24). He observed other deputies establishing a perimeter. (Tr. 142:5-7).

Deputy Chavez testified that he approached the vehicle, saw that the headlights and taillights were on, noticed that the engine was still running, and heard the RPMs[8] fluctuating. (Tr. 142:15-17; 143:15, 144:25-145:1). Deputy Chavez also recalled the vehicle rocking slightly back and forth. (Tr. 145:10-11, 19-20). As he approached the B pillar, he confirmed that there was no human in the vehicle, but he observed a small unrestrained white and brown dog inside. (Tr. 146:16-24; 147:1-4). From his location at the B pillar, Deputy Chavez looked through the window at the dashboard and could see that the vehicle was in drive. (Tr. 147:11-13). He opened the unlocked driver's side door, grabbed the steering wheel with his left hand for balance, placed his right foot on the brake, and with his right hand grabbed the gear shifter and placed the vehicle

---

[7] The B pillar is the section of metal on a vehicle located between the area where the front door ends and the back door begins. (Tr. 148:22-23).
[8] "RPM" stands for revolutions per minute.

in park. (Tr. 149:15-25). He does not recall turning the vehicle off. (Tr. 156:5-7). Deputy Chavez testified that his "sole purpose was just to make the vehicle safe and place it in park," concerned that at any time the vehicle could start rolling forward towards other deputies on the scene who were less than 20 yards in front of the vehicle. (Tr. 150:12-13, 150:20-151:2, 151:10-11; 152:21-153:1). As Deputy Chavez was exiting the vehicle, he "noticed a rubber grip which appeared to be a handgun in a black holster" located on the floorboard near the driver's seat. (Tr. 153:18-19, 154:3-5, 23). He shut the door without disturbing the firearm. (Tr. 155:3-7).

Meanwhile, Deputy Castaneda and Deputy Heredia had been talking to residents of the RV. (Tr. 48:16-19). One of the RV residents indicated that he recognized the vehicle, described the dog, and advised that there was a woman and a man living in the house at 217 Knotts Landing. (Tr. 49:5-9). Upon leaving the RV, Deputy Castaneda heard Deputy Schlanger yell out several commands from the northwest corner of the property. (Tr. 49:22-50:5). He ran in Deputy Schlanger's direction and observed Defendant lying in a pit on his stomach. (Tr. 50:8-19). Deputy Castaneda identified Defendant as the driver he had stopped at the gas station, and Defendant was placed under arrest for aggravated fleeing from law enforcement and traffic violations. (Tr. 53:1-23). While Deputy Castaneda was talking to Defendant, Deputy Chavez approached and advised that there was a gun inside the vehicle Defendant had been driving. (Tr. 54:12-15). Deputy Castaneda then asked Defendant if he was a felon, to which Defendant responded "Yes, sir." (Tr. 55:3-15; Gov't Ex. 6, Transcript of Deputy Schlanger's Belt Tape at 8). As Deputy Castaneda walked with Defendant by the vehicle's window en route to his patrol unit, he could clearly see the gun on the floorboard by the driver's seat in the area Deputy Chavez had described. (Tr. 59:16-20; 60:9-12).

Deputy Castaneda secured Defendant in the patrol unit and began to run Defendant's personal information, which reflected numerous arrests and a suspended driver's license. (Tr. 56:24-57:9). Because Defendant was under arrest and had a suspended license, in accordance with BCSO Standard Operating Procedure (SOP), the decision was made to tow the vehicle Defendant had been driving and to conduct an inventory prior to towing. (Tr. 57:10-14; Gov't Ex. 7, BCSO SOP 311-1 & 311-2). Deputy Heredia conducted the vehicle inventory, and when she finished taking photographs of the gun, Deputy Castaneda took possession of it. (Tr. 61:1-3). The tow company will not tow a vehicle when there is an unsupervised weapon inside. (Tr. 66:21-67:1). However, when the inventory prior to tow was "pretty much already done," a female emerged from the 217 Knotts Landing residence, claiming ownership of the vehicle. (Tr. 62:2-5). The female, identified as C.B., provided Deputy Castaneda with her driver's license. (Tr. 62:5-6). With that information, Deputy Castaneda was able to confirm that C.B. was the vehicle's registered owner permitting him to release the vehicle to her. (Tr. 62:5-20; Gov't Ex. 7, BCSO SOP 311-2). Deputy Castaneda gave the vehicle keys to C.B., and C.B. took possession of the dog. (Tr. 63:6-12). C.B. also informed Deputy Castaneda that she knew Defendant and was aware that he had been using her car, but she disclaimed any knowledge or ownership of the firearm. (Tr. 63:16-64:16). Because C.B. denied ownership of the gun, Deputy Castaneda did not release the gun to her. (Tr. 63:13-16).

Deputy Castaneda subsequently drove Defendant to the South Valley Command Center where he ran Defendant's information through the National Crime Information Center (NCIC) at which point he determined that Defendant was a convicted felon. (Tr. 66:2-15). The firearm seized from the vehicle, which was loaded with four rounds of ammunition, was tagged into evidence. (Tr. 61:12-21).

## II.    LEGAL STANDARD

"Suppression of evidence is an appropriate remedy only when the search violates a person's constitutional rights." *U.S. v. Gama-Bastidas*, 142 F.3d 1233, 1238 (10th Cir. 1998). "The proponent of a motion to suppress has the burden of adducing facts at the suppression hearing indicating that his own rights were violated by the search." *Id.* (internal quotation marks and citation omitted). However, it is the government's burden to show the admissibility of the evidence it seeks to introduce. *See U.S. v. Mikolon*, 719 F.3d 1184, 1189 (10th Cir. 2013).

## III.    ANALYSIS

Defendant does not challenge the validity of the initial traffic stop or his subsequent arrest. Rather, Defendant argues that officers conducted an unlawful warrantless search of the vehicle he was driving and unlawfully seized the firearm in violation of his Fourth Amendment rights. The primary issues are: (1) whether Defendant has standing to challenge any search of the vehicle and seizure of the firearm; (2) whether the plain view doctrine applies; and (3) whether the inventory search of the vehicle was lawful, thereby invoking the inevitable discovery doctrine.

### A. Defendant Has Standing to Seek Suppression of the Evidence Seized From the Vehicle

A defendant can challenge a search under the Fourth Amendment if "the defendant manifested a subjective expectation of privacy in the area searched and [if] society is prepared to recognize that expectation as objectively reasonable." *United States v. Eckhart,* 569 F.3d 1263, 1274 (10th Cir. 2009) (internal quotation marks and citation omitted). The law is established that an individual who is the vehicle's driver but not the registered owner "plainly ha[s] a reasonable expectation of privacy in the vehicle and standing to challenge the search of the vehicle" if the driver establishes "that he gained possession from the owner or someone with authority to grant

possession." *U.S. v. Valdez Hocker*, 333 F.3d 1206, 1209 (10th Cir. 2003) (internal quotation marks and citation omitted). Here, Defendant asserts that the vehicle's owner is a friend who often allows him to use her car and had allowed him to use the car on January 8, 2018. (Doc. 26 at 3). Hearing testimony supports this assertion. (Tr. 72:22-73:7).

The United States contests Defendant's standing to challenge the vehicle search, but not on the basis of whether Defendant had permission to drive the car. (Doc. 32 at 6-8,Tr. 201:24-203:3). Rather, the United States argues that Defendant lacks standing because he abandoned the vehicle. (Doc. 32 at 6). "Abandonment is akin to the issue of standing because the defendant lacks standing to complain of an illegal search or seizure of property which he had abandoned." *U.S. v. Garzon*, 119 F.3d 1446, 1449 (10th Cir. 2006). "An expectation of privacy is a question of intent which may be inferred from words, acts, and other objective facts." *U.S. v. Austin*, 66 F.3d 1115, 1118 (10th Cir. 1995) (internal quotation marks and citation omitted). In addition to exhibiting a subjective expectation of privacy, a defendant's expectation of privacy must also "be one that society would recognize…as *objectively* reasonable for the search to have violated the Fourth Amendment." *Austin*, 66 F.3d at 1118 (internal quotation marks and citation omitted). Finally, "[a]n abandonment must be voluntary," *Austin*, 66 F.3d at 1118, but "it is well-settled that police pursuit or investigation at the time of abandonment of property, without more, does not itself render abandonment involuntary," *U.S. v. Tubens*, 765 F.3d 1251, 1256 (10th Cir. 2014) (internal quotation marks and citation omitted).

The United States claims that by fleeing the vehicle and leaving the keys in the ignition—with the vehicle running and in gear, the driver's side door unlocked, the headlights on, and a dog inside—Defendant voluntarily abandoned the vehicle and its contents. (Doc. 32 at 7; Doc. 54 at 13). The United States relies heavily on an unpublished opinion from the Tenth Circuit

Court of Appeals, *United States v. Quintana-Grijalva*, 332 F. Appx. 487 (10th Cir. 2009), to support its position. In *Quintana-Grijalva*, the Tenth Circuit held that the defendant lacked standing to challenge seizure of marijuana from the truck he was driving. 332 Fed. Appx. at 496. In reaching this conclusion, the Tenth Circuit first noted that defendant's conduct in fleeing from the truck following pursuit "is clearly demonstrative of his subjective intent." *Id.* at 491. Turning to the objective component of the abandonment inquiry, the court found that the defendant "did not retain a reasonable expectation of privacy in the truck or any of its contents when he fled from the truck, leaving the doors open and the marijuana (and other objects) inside." *Id.* at 492. Finally, the court found the abandonment was voluntary because it was not preceded by a Fourth Amendment violation. *See id.* at 492-93 ("An abandonment is involuntary only when preceded by a Fourth Amendment violation; the abandonment must *result from* the violation." (internal quotation marks and citation omitted) (emphasis in original))).

Several circuit courts of appeal have reached similar results in cases factually similar to this one. *See, e.g., U.S. v. Falsey*, 566 Fed. Appx. 864, 867-68  (11th Cir. 2014) (holding that a defendant abandoned his car when he left it unlocked with the keys on the passenger side floor board in a parking lot of a business park as he fled believing he was being pursued by police); *U.S. v. Smith*, 648 F.3d 654, 660 (8th Cir. 2011) (holding that a defendant abandoned his car when he left it unlocked in a Taco Bell drive-through lane, with the keys in the ignition and the motor running, as he fled on foot from the police); *United States v. Vasquez*, 635 F.3d 889, 892, 894 (7th Cir. 2011) (concluding that a defendant abandoned his car when he left it in a Walmart parking lot before fleeing on foot from the police); *U.S. v. Edwards*, 442 F.2d 749, 750, 752 (5th Cir. 1971)(holding a defendant abandoned his car when he fled from police on foot, leaving the headlights on and the engine running on a public road); *U.S. v. D'Avanzo*, 443 F.2d 1224, 1225-

26 (2d Cir. 1971) (upholding a finding of abandonment where the defendant parked the car he was driving on a residential street and then fled from the police in a nearby wooded area).

Even if the Court were to adopt the *Quintana-Grijalva* court's supposition that fleeing from a vehicle following pursuit is "clearly demonstrative" of a subjective intent to abandon the property, the Court agrees with Defendant that a key factor in this case sets it apart from *Quintana-Grijalva* and the other circuit court cases cited above. Defendant claims that he demonstrated a subjective intent to maintain an expectation of privacy in the vehicle and its contents because he drove the vehicle to his place of residence, and that this expectation of privacy was objectively reasonable. (Doc. 49 at 3-4). In all of the cases in which courts found abandonment, the vehicle in question had been left on a public roadway or in a parking lot of a commercial business. In this case, Defendant drove the vehicle some distance from the initial traffic stop to his place of residence, leaving it only feet from the house, with the door closed, and his dog still inside. Prior to the search, the RV occupants living on the property also confirmed with officers that they recognized the vehicle and described the brown and white dog. Under these circumstances, it is objectively reasonable for Defendant to have maintained an expectation of privacy in the vehicle and its contents. The Court finds that Defendant has standing to challenge any alleged Fourth Amendment violation.

### B. The Plain View Doctrine Does Not Apply

The United States invokes the plain view doctrine to justify the seizure of the firearm from the vehicle Defendant was driving. The plain view doctrine permits warrantless seizure of evidence "if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object." *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993); *see also U.S. v. Soussi*, 29 F.3d 565, 570

(10th Cir. 1994) (reiterating the proper analysis under the plain view doctrine). With respect to an object's incriminating character, the plain view doctrine is satisfied where a law enforcement officer has probable cause to believe that the object is contraband. *Minnesota*, 508 U.S. at 375. "The principal components of a determination of…probable cause will be the events which occurred leading up to the stop or search, and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to…probable cause." *Ornelas v. U.S.*, 517 U.S. 690, 696 (1996).

**1. Deputies Were in a Lawful Position to View the Firearm**

The Court first finds that Deputy Chavez's warrantless entry into the vehicle was justified by the community caretaker exception to the Fourth Amendment. The Tenth Circuit "ha[s] recognized that, in fulfilling their duties, police officers may exercise functions – community caretaking functions – wholly separate and apart from detecting, investigating, or acquiring evidence of a crime." *Lundstrom v. Romero*, 616 F.3d 1108, 1120 (10th Cir. 2010). In this case, Deputy Chavez was clearly exercising his "community caretaking function" when he entered the vehicle to place it in park. Deputy Chavez credibly testified that after arriving on the scene, he walked towards the vehicle and noticed that the taillights and headlights were on, the engine was still running, the RPMs (revolutions per minute) were fluctuating, the vehicle had "a slight rock to it as it was idling," and a small dog was moving freely about the vehicle. (Tr. 142:15-17; 143:15; 145:8-20). Looking through the window to the dashboard, Deputy Chavez could see that the vehicle was still in drive, and finding the doors unlocked, entered the vehicle to place it in park without disturbing any items. (Tr. 147:11-13; 149:15-150:3). When exiting the vehicle, he saw the gun on the floorboard, but did not touch it. (Tr. 153:17-19; 155:3-16). Deputy Chavez testified that his "sole purpose…was to place the vehicle in park…to make the vehicle safe as at

any time it could have started rolling forward," and other officers were approximately 20 yards away in the vehicle's path. (Tr. 150:20-151:11; 152:12-153:1).

Defendant contends that Deputy Chavez's testimony is "wildly inconsistent" with Deputy Castaneda's testimony that he did not detect any motion from the vehicle or recall hearing the vehicle's motor running as he approached, rendering Deputy Chavez's testimony "not credible." (Doc. 49 at 5). The Court disagrees. In response to the Court's questions, Deputy Castaneda testified that he could not recall whether there was any vibration or sound from vehicle, explaining that his focus as he approached the vehicle was on ascertaining whether there was a person in the vehicle. (Tr. 105:12-107:17). In light of the evidence presented at the hearing, the Court finds that under the community caretaking function, Deputy Chavez was lawfully in a position from which to view the gun in plain view.

Consequently, Deputy Castaneda was also in a lawful position from which to view the gun through the vehicle's window as he walked Defendant back to the patrol unit. (Tr. 59:14-23). Because the Court has already determined that Deputy Chavez's initial entry into the vehicle was valid, Deputy Castaneda's plain view of the gun is also valid even though his "plain view" only occurred because Deputy Chavez alerted him to the gun's location. *See U.S. v. Dennison*, 410 F.3d 1203, 1209 n.1 (10th Cir. 2005) (noting that the officer's "plain view" occurred only because of and after another officer's search of the vehicle passenger compartment, rendering it necessary to determine first whether the "initial intrusion" to search the vehicle was valid).

## 2.  The Incriminating Character of the Gun Was Not Immediately Apparent

This does not end the Court's inquiry. Defendant challenges the government's claim that the incriminating character of the gun was immediately apparent at the time Deputy Chavez entered the vehicle. (Doc. 26 at 7). New Mexico laws pertaining to firearms are some of the least

restrictive in the country. They permit the open carry of loaded firearms without a permit, including carrying them inside a vehicle, and concealed carry of a handgun with a proper license, *see* NMSA 1978, § 29-19-1, et al. As a result, simply having a gun in a vehicle does not per se render that gun contraband.

Further, there was nothing immediately unlawful about the configuration of the gun or the circumstances surrounding the traffic stop to connect the gun with criminal activity. *See, e.g., U.S. v. Szymkowiak*, 727 F.2d 95, 98-99 (6th Cir. 1984) (concluding that, based on the facts available to the officers executing a search warrant, the incriminating nature of a weapon seized from the premises was not immediately apparent to the seizing officers); *but cf. U.S. v. Jimenez*, 864 F.2d 686, 690 (10th Cir. 1988) (applying the plain view doctrine and noting that that there was sufficient evidence the officer could tell that the stock had been cut off of the shotgun and the barrel was not of normal length, giving rise to probable cause that the shotgun was associated with criminal activity because of its configuration); *U.S. v. Metts,* COA No. 17-2111 (10th Cir. Sept. 5, 2018) (concluding that the incriminating nature of a gun located in the defendant's car was readily apparent under the plain view doctrine because officers had just arrested the defendant for robbery and assault with a deadly weapon); *U.S. v. Schmidt*, 700 F.3d 934, 939 (7th Cir. 2012) (holding that the plain view doctrine applied to seize a firearm where the scope and breech of the firearm were seen, and based on recent shots heard, bullet holes, and a trail of spent casings in the backyard, the officer had probable cause to believe the firearm to which the scope and breech belonged was linked to gunshots in the area). The only information Deputy Chavez had upon arriving at Knotts Landing Court was that a brown vehicle had fled from a routine traffic stop conducted by Deputy Castaneda and had pulled into property in that area. (Tr.

137:25-138:7). Accordingly, at the time Deputy Chavez viewed the gun its incriminating character was not immediately apparent.

Nevertheless, the United States argues that the incriminating nature of the gun was immediately apparent to Deputy Castaneda for two reasons: (1) Defendant replied "Yes, sir" when asked by Deputy Castaneda if he was a felon; and (2) Defendant's conduct during the initial traffic stop generated probable cause to believe Defendant had contraband in the vehicle. (Doc. 32 at 12-14).

   a. *Defendant's Pre-Miranda Statement Cannot be Used to Develop Probable Cause*

This Court previously suppressed statements Deputy Castaneda elicited from Defendant in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966), including Defendant's pre-*Miranda* admission that he is a felon. *See* Order (Doc. 35)). Yet, the United States argues that under *United States v. Patane*, 542 U.S. 630 (2004), the Court can still consider Defendant's pre-*Miranda* statement admitting that he is a felon in the context of a suppression hearing to assess the officer's probable cause to believe the gun was evidence of a crime. (Doc. 54 at 21-23).[9] The United States' principal argument is that the unwarned statement can be used because it does not implicate Defendant's self-incrimination right at trial. (Doc. 54 at 23).

In *Patane*, police officers seized a gun after the defendant disclosed the physical gun's location in response to custodial questioning without *Miranda* warnings. 542 U.S. at 635. The Supreme Court reversed the Tenth Circuit Court of Appeals' decision to exclude the gun as fruit of the poisonous tree, holding that failure to provide *Miranda* warnings does not require the "suppression of the physical fruits of the suspect's unwarned but voluntary statements." 542 U.S.

---

[9] Curiously, in its response to Defendant's supplemental briefing (Doc. 61), the United States appears to retreat from its stance that it seeks to use Defendant's un-*Mirandized* statement for purposes of the suppression motion to develop probable cause to seize the firearm under the plain view doctrine, and now states that officers seized the firearm irrespective of Defendant's unwarned statement. (Doc. 61 at 2-3).

at 634. The Supreme Court reasoned that "the *Miranda* rule is a prophylactic employed to protect against violations of the Self-Incrimination Clause. The Self-Incrimination Clause, however, is not implicated by the admission into evidence of the physical fruit of a voluntary statement." *Id.* at 636. In other words, the admission of such physical fruit presented no risk that the defendant's statements would be used against him at a criminal trial. *Id.* at 643. However, the Supreme Court did not address the precise boundaries of the Self-Incrimination Clause which provides: "No person…shall be compelled in *any criminal case* to be a witness against himself." U.S. Const. amend. V (emphasis added).

In the context of a 42 U.S.C. § 1983 action based in part on an alleged Fifth Amendment violation, the Tenth Circuit addressed the boundaries of the Self-Incrimination Clause, a task the *Patane* Court avoided, and interpreted the phrase "in any criminal case" to encompass pretrial proceedings. *See Vogt v. City of Hays*, *Kansas,* 844 F.3d 1235 (10th Cir. 2017).[10] Specifically, the Tenth Circuit held that the right against self-incrimination applies to the use of statements in a probable cause hearing as well as at trial. *Id.* at 1246. In doing so, the Tenth Circuit joined the Second, Seventh, and Ninth Circuits, all of which have concluded that the right against self-incrimination is more than a trial right. *See, e.g., Higaz v. Templeton,* 505 F.3d 161, 171, 173 (2d Cir. 2007) (reaffirming that a bail hearing is part of a "criminal case" under the Fifth Amendment); *Best v. City of Portland*, 554 F.3d 698, 702-03 (7th Cir. 2009) (holding that a criminal case under the Fifth Amendment includes suppression hearings); *Stoot v. City of Everett*, 582 F.3d 910, 925 (9th Cir. 2009) (holding that a Fifth Amendment violation occurs when "[a] coerced statement has been relied upon to file formal charges against the declarant, to determine judicially that prosecution may proceed, and to determine pretrial custody status"). In

---

[10] The U.S. Supreme Court granted writ of certiorari in this case but it was later dismissed as improvidently granted. *See City of Hays, Kans. V. Vogt*, 138 S. Ct. 1683 (May 29, 2018).

this case, the United States is not merely arguing that the physical evidence of the *Miranda* violation – the gun located in the vehicle – should be admitted. Were this the case a straight analysis under *Patane* would follow. Rather, the United States is specifically seeking to use Defendant's own un-*Mirandized* statement, itself testimonial evidence, against him in a pretrial proceeding (i.e. the suppression hearing) to support the officers' development of probable cause to immediately believe the gun was contraband and justify its seizure under the plain view doctrine. The *Vogt* Court made it clear that the Fifth Amendment privilege against self-incrimination extends to pretrial proceedings. Accordingly, having suppressed Defendant's pre-*Miranda* statement conceding that he was a felon, the Court holds that the United States may not use that statement to develop probable cause for purposes of Defendant's motion to suppress.[11]

b. Deputy Castaneda lacked independent probable cause to believe the firearm was evidence of a crime based on Defendant's conduct during and immediately following the traffic stop

The United States also avers that Deputy Castaneda had independent probable cause to believe the gun he viewed through the vehicle's window was contraband because of Defendant's conduct during and immediately after the initial traffic stop at the gas station. (Doc. 32 at 12-13). Defendant rejects this argument. (Doc. 26 at 4-5). Based on the evidence, the Court concludes that Deputy Castaneda lacked probable cause under the plain view doctrine to immediately believe the gun was contraband or evidence of a crime. The incriminating nature of the firearm seized was not immediately apparent to Deputy Castaneda or to any other officer.

---

[11] For the first time in his supplemental brief (Doc. 57) Defendant argues that his statement was not voluntary, a factor important to the analysis of admission of physical evidence discovered as fruits of a *Miranda* violation and to this present analysis. In response the United States refers to these voluntariness arguments as a "tangential issue" and does not directly address whether Defendant's statement was voluntary. (Doc. 61 at 1). Because the United States conceded to suppress Defendant's pre-*Miranda* statements without directly addressing whether it was voluntary, and the Court ultimately suppressed the statement, the Court will assume for purposes of this Motion that the statement was not voluntary.

Deputy Castaneda described Defendant's movements as furtive and testified that as Defendant entered the gas station Defendant rolled his shoulder, leaning forward, as though he "was reaching down underneath his seat or towards the floorboard," as though reaching for something or trying to hide something. (Tr. 23:6-14; 78:22-79:1). He noted that Defendant continually looked at him through his rear and side view mirrors, and testified that Defendant's behaviors, combined with how long it took Defendant to stop, and his subsequent fleeing from the gas station at an accelerated speed, caused him to have concerns for officer safety. The government argues that these circumstances articulated by Deputy Castaneda are sufficient to support probable cause for Deputy Castaneda to immediately believe the gun he viewed was contraband. The Court disagrees.

Defendant's behaviors might be enough to develop reasonable suspicion for a protective pat-down in a *Terry* stop situation or to continue an investigative stop, but they do not cross the threshold into probable cause. *See, e.g., Illinois v. Wardlow,* 528 U.S. 119, 124 (2000) (finding that nervous, elusive behavior is a pertinent factor in determining reasonable suspicion). Though a "high degree of certainty as to the incriminatory character of evidence is [not] necessary for an application of the plain view doctrine," *Texas v. Brown*. 460 U.S. 730, 741 (1983), there is not enough here to generate independent probable cause, outside of Defendant's suppressed statement, to believe the gun was evidence of a crime or to render the gun's character immediately incriminating. The very fact that Deputy Castaneda needed to run information through the NCIC back at the station to obtain facts not readily available to him, including Defendant's criminal history and status as a convicted felon, further supports the conclusion that Deputy Castaneda did not form probable cause that the gun was incriminating when he initially viewed it. *See, e.g., Szymkowiak*, 727 F.2d at 98-99 (holding that the incriminating character of a

weapon was neither "immediate" or "apparent" where officers could not say without disassembling the weapon whether it violated state or federal law, and where the officers had to call NCIC and ATF for additional information, indicating to the Court that officers did not form probable cause that the weapon was incriminating from facts available to them at the time of the initial viewing). Accordingly, the Court finds that the incriminating nature of the firearm was not readily apparent to Deputy Castaneda at the time he viewed the gun through the vehicle's window, and any seizure of the gun did not lawfully occur under the plain view doctrine.

### C. Deputies Lawfully Seized the Gun in Accordance with a Valid Inventory Search

Alternatively, the United States argues that even if the officers did not lawfully seize the gun under the plain view doctrine, deputies would have inevitably discovered and seized the handgun as part of the vehicle inventory conducted in preparation for towing the vehicle under BCSO's Operating Procedures. (Doc. 32 at 15-16.) *See U.S. v. Cunningham*, 413 F.3d 1199, 1203 (10th Cir. 2005) (citations omitted) ("The inevitable discovery doctrine provides an exception to the exclusionary rule and permits evidence to be admitted if an independent, lawful police investigation inevitably would have discovered it."). Inventory searches "are now a well-defined exception to the warrant requirement of the Fourth Amendment." *U.S. v. Tueller*, 349 F.3d 1239, 1243 (10th Cir. 2003) (internal quotation marks and citation omitted).

A warrantless inventory search is proper when the search is conducted pursuant to standard police procedures for administrative purposes of protecting the car and its contents. *See U.S. v. Lugo*, 978 F.2d 631, 636 (10th Cir. 1992) ("When the police acquire temporary custody of a vehicle, a warrantless inventory search of the vehicle does not offend Fourth Amendment principles so long as the search is made pursuant to standard operating procedures and for the purpose of protecting the car and its contents." (internal quotation marks and citation omitted)).

"If a police officer performs an inventory search of a vehicle before ultimately deciding not to have it towed, a court must determine 'whether at the time of the inventory search [the officer] reasonably believed the car would be towed.'" *U.S. v. Kelly,* Cr. No. 10-2057 JB, 2010 WL 5173599, *9 (D.N.M. Nov. 17, 2010) (quoting *U.S. v. Henderson*, 61 F.3d 906, at *3 (7th Cir. 1995)).

The Bernalillo County Sheriff's Department Standard Operating Procedure (SOP) provides that when an arrest or citation is made of a driver for driving with a suspended or revoked license, or when the driver has been arrested, "vehicles will be towed at the direction" of the deputy. (Gov't Ex. 7, 311-1). The SOP continues that a complete inventory must be taken of all property left in the towed vehicle, and any items taken for "safekeeping" must be processed in accordance with the evidence SOP. (Gov't Ex. 7, SOP 311-2). A deputy may, however, release the vehicle to the "verified registered owner" if that individual is present. (*See id.*). In this case, Defendant was arrested for aggravated fleeing of an officer and traffic violations, and Deputy Castaneda learned through his mobile data terminal (MDT) search that Defendant's license was suspended. It was therefore within BCSO policy to tow the vehicle and conduct an inventory of the vehicle prior to the tow. Yet, Defendant's primary contention centers on the timing of the inventory search in relation to when C.B. came forward and was confirmed to be the vehicle's owner. The United States claims that *after* Deputy Heredia inventoried the vehicle, the registered owner, C.B. exited a nearby residence and the vehicle was released to her. (Resp. at 16). Defendant asserts that deputies had contact with C.B. *before* deputies starting taking inventory photographs, thereby obviating the need for an inventory search and rendering the gun's seizure unlawful.

To support his argument, Defendant relies on Defense Exhibit D, a sheet containing metadata that defense counsel's paralegal extracted from digital photographs that Deputy Heredia took during the vehicle inventory. (Defense Ex. D). Defendant concludes, based on Defendant's reading of the metadata in Defense Exhibit D in conjunction with the Government's Exhibit 21, a Computer Aided Dispatch (CAD) log, that deputies "clearly already had contact with [C.B.] prior to the beginning of the inventory search" because the license number reflected in the CAD could not have come from any source other than directly from C.B., and that number was entered into the CAD before the time indicated on the first inventory photograph. (*See* Doc. 41 at 2-3).[12]  Defendant did not present testimony, expert or otherwise, to establish the authenticity and reliability of the metadata, leading to conclusions that appear speculative and based on unsupported assumptions. As a result, the Court does not afford much weight to this evidence. *See* 07/19/18 Memorandum Opinion and Order (Doc. 48); *see also U.S. v. Wilkins*, Cr. No. 15-00232-CR-W-HFS, 2016 WL 2616497 (W.D. Mo. Apr. 8, 2016) (noting that metadata can be misleading and concluding that expert testimony would be required before the court could rely on a sheet of metadata extracted from digital photographs that was prepared by the defendant's private investigator).

Deputy Castaneda testified credibly and unambiguously that the inventory of the vehicle prior to tow was nearly complete when C.B. emerged from the residence, claimed ownership of the vehicle, and provided her license to Deputy Castaneda. (Tr. 62:2-6). At that point, Deputy Castaneda took C.B.'s license to his patrol unit, ran her information through his MDT, and confirmed that she was the vehicle's registered owner. (Tr. 62:6-9). Because BCSO procedure allows a deputy to release a vehicle that would otherwise be towed to the verified registered

---

[12] DEFENDANT'S MOTION IN LIMINE IN SUPPORT OF THE ADMISSION OF DEFENDANT'S EXHIBIT D INTO THE RECORD (Doc. 41).

owner if that person is present at the time the officer arrests the driver, Deputy Castaneda properly released the vehicle to C.B. (Gov't Ex. 7, BCSO SOP 311-2; Tr. 62:7-20). Deputy Castaneda reiterated in response to counsel's questions that these events took place after the inventory search was complete, and when the gun was already in Deputy Castaneda's possession because he could not leave an unsupervised weapon in a vehicle that was going to be towed. (Tr. 116:19-117:8). Finally, Deputy Castaneda testified that because C.B. denied ownership of the gun and ammunition located in the vehicle, he could not leave it in her possession, so he took the gun to tag it into evidence. (Tr. 64:13-16).

The Court finds that deputies would have inevitably discovered the handgun, and lawfully seized the gun, pursuant to a valid inventory search before having the vehicle towed. The deputies here were following written standardized procedures, and there is no evidence that they "acted in bad faith or for the sole purpose of investigation." *Colorado v. Bertine*, 479 U.S. 367, 373 (1987). When Deputy Heredia began the inventory search, Deputy Castaneda reasonably believed that the vehicle was going to be towed in accordance with BCSO policy. When C.B. came forward with proof that she was the registered owner after the inventory search was nearly complete, Defendant Castaneda released the vehicle to her, also in accordance with BCSO procedure, rather than having it towed. The inventory search and subsequent seizure of the gun did not offend the Fourth Amendment.

IT IS THEREFORE ORDERED THAT Defendant Manuel Chavez's Motion to Suppress Search of Vehicle (Doc. 26) is DENIED.

_____
SENIOR UNITED STATES DISTRICT JUDGE